IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

|  |  |
|---|---|
| ADELINE CLARK, *et. al*, <br><br> Plaintiffs, <br><br> v. <br><br> FRONTIER AIRLINES, INC., <br><br> Defendant. | Civil Action No. <br> 4:17-cv-00452-JEG-HCA |

**SUPPLEMENTAL DECLARATION OF CHRIS A. HOLLINGER
IN SUPPORT OF DEFENDANT FRONTIER AIRLINES, INC.'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

I, Chris A. Hollinger, submit the following supplemental declaration in support of the motion to dismiss filed by Defendant Frontier Airlines, Inc. ("Frontier") in the above-captioned matter.

1.     I am a partner with the law firm of O'Melveny & Myers LLP and the attorney principally responsible for the representation of Frontier in this matter.  I am an attorney licensed to practice law in the State of California and have been admitted *pro hac vice* in the Southern District of Iowa in this action.

2.     I participated as Frontier's counsel in the March 20, 2018 hearing in the labor arbitration referenced in Plaintiffs' First Amended and Substituted Complaint (¶ 17).  The following materials are part of the evidentiary record from the arbitration:

(a)     Exhibit A to my Declaration is a true and correct copy of an excerpt from the March 20, 2018 hearing transcript.  I direct the Court's attention, in particular, to Mr. Walke's remarks at page 9, lines 7-11.

(b)     Exhibit B to my Declaration is a true and correct copy of Article 24 of the 2011-2016 Frontier-AFA Collective Bargaining Agreement ("CBA").

(c)     Exhibit C to my Declaration is a true and correct copy of Article 2 of the 2011-2016 Frontier-AFA CBA.

(d)     Exhibit D to my Declaration is a true and correct copy of excerpts from the March 20, 2018 hearing transcript.  I direct the Court's attention, in particular, to Ms. Thompson's testimony at page 181, line 14 through page 185, line 22; Ms. Peter's testimony at page 250, lines 2-10; Ms. France's testimony at page 58, lines 5-25; and Mr. Shaw's testimony at page 80, lines 3-12.

3.     The evidentiary record in the arbitration was closed as of May 1, 2018, with Plaintiffs' submission of written testimony from Darol Glasscock.  The parties' post-hearing briefs are scheduled to be filed on June 15, 2018.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on May 3, 2018 in San Francisco, California

_____/s/ *Chris A. Hollinger*_____
Chris A. Hollinger

# Exhibit A

*In Re:*

*Equity Participation Grievance*

*Transcript of Proceedings*

*March 20, 2018*



Stevens-Koenig
Reporting

700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

```
 1                    FRONTIER AIRLINES

 2  _____

 3  IN THE MATTER OF THE EQUITY PARTICIPATION GRIEVANCE:

 4  THE GRIEVANTS,

 5  and

 6  FRONTIER AIRLINES, INC.,

 7  and

 8  ASSOCIATION OF FLIGHT ATTENDANTS-CWA.

 9  _____

10                  TRANSCRIPT OF PROCEEDINGS
11                      March 20, 2018
12

13  _____

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 9

1   summarize that discussion for the record.

2           The parties indicated to the board that

3   sequestration is not necessary, and so the record will

4   reflect that witnesses are in the hearing room.

5           Despite the arbitrators' best efforts, the

6   parties were not able to agree to an issue in dispute.

7   The Grievants state the issue as, did the Company

8   violate Article 24 of the Collective Bargaining

9   Agreement when the Company failed to pay Grievants

10  equity payments covering the period of January 1, 2012,

11  through March 15, 2017.  If so, what is the appropriate

12  remedy.

13          The Company frames the issue -- I should say,

14  the Company and the Union frame the issue as whether the

15  March 15, 2017, Equity Participation Letter of Agreement

16  violated Article 24 of the Collective Bargaining

17  Agreement.  If so, what shall be the remedy.

18          The board is still encouraging the parties to

19  try to stipulate to the issue in dispute, so we will try

20  to revisit this problem later in the hearing.  However,

21  if we remain with a dispute on the issues, the parties

22  stipulated that the board is empowered to either adopt

23  the Grievants' issue, adopt the Union's issue, or frame

24  its own issue.

25          We marked several joint exhibits.  Let me

# Exhibit B

**ARTICLE 24**
**EQUITY, PROFIT-SHARING, AND WAGE & BENEFIT SNAPBACKS**

A.     **EQUITY PARTICIPATION**

Flight Attendants will be entitled to equity in the Company (the "Equity Participation") as described herein:

1.     The value of the Equity Participation is $16.0 million.

2.     The Equity Participation value will be converted to first dollar equity in the Company at a ratio of the greater of $0.18 per dollar of new equity invested in the Company, or any higher rate offered to any other key stakeholder in the restructuring process.

3.     The terms of the Equity Participation by and for the benefit of the Participating Flight Attendants will be equal to the terms obtained by a third party investor in an Equity Event or, if the Equity Event is a public offering of securities in the Company, the form of securities offered in the public offering.

4.     Other minority investor rights by and for the benefit of the Participating Flight Attendants will be negotiated, including tagalong rights and customary dragalong rights.

5.     Vesting:  The Equity Participation will vest in proportion to the actual Investments as set forth in the letter dated October 11, 2011 between the Company and the Union entitled "Flight Attendant Restructuring Investments".  To the extent the Investments as set forth in the referenced letter cease or are not made, the value of the Equity Participation in Paragraph A.1.a above will be reduced by the net present value discount rate of 15%

B.     **PROFIT SHARING PROGRAM.**

The Company has established a Profit Sharing Plan (the "PSP") for employees participating in the Company's restructuring efforts. According to the terms of the PSP, the Company will make contributions as follows:

1.     For pre-tax earnings greater than 2%, but less that 4% of total Company revenue, 50% will be contributed to the PSP.

2.     For pre-tax earnings greater than 4%, but less than 6% of total Company revenue, 25% will be contributed to the PSP.

3.     For pre-tax earnings greater than 6% of total Company revenue, 10% will be contributed to the PSP.

4.     50% of contributions to the PSP will be allocated to the Frontier

pilots and the remaining 50% will be allocated to the other participating Frontier employee groups in proportion to their contribution. The proportional share of the Flight Attendant group is 18% of the 50% share of the non-pilot groups.

5.   The Company will distribute all profit sharing payments no later than April 30 of each year based on the audited results from the preceding calendar year.

## C.   SNAPBACKS

1.   The overtime threshold, per diem and holiday pay will be reinstated if the Company is profitable for two consecutive years with pretax profits in excess of 5%, after profit sharing.

2.   The Company's matching contribution to the 401K Plan will be reinstated if the Company posts 2 straight years of pre-tax profits in excess of 5%, after profit sharing. The Company retains the right to restore the Company's matching contribution partially or fully in its discretion. Effective with the first paycheck in July 2016, the Company's matching contribution to the 401k Plan will be reinstated.

## D.   ADDITIONAL PROVISIONS

Equity Participation as set forth in Paragraph A above and participation in the PSP as set forth in Paragraph B above, will be exclusively for Frontier Flight Attendants on the Frontier Flight Attendant Seniority List as of January 1, 2012. This exclusion includes anyone who changes Class and Craft as outlined in Article 10 Seniority of this Agreement.

Exhibit C

J 1



## Association of Flight Attendants-CWA
## AFL-CIO

# Frontier Airlines
# Flight Attendant Contract

# 2011-2016

## ARTICLE 2
## DEFINITIONS

1. **Active** –The time a Flight Attendant is available for Duty Assignment or on paid time off.   A Flight Attendant on leave of absence, furlough, or another "no pay" status is not considered active, unless otherwise specified in this Agreement.

2. **ADD** – To pick up additional trips in order to increase the value of a Flight Attendant's line or to replenish his/her sick bank.

3. **Affiliate** – As used in this Agreement, the term "Affiliate" refers to: any Parent; any Entity that Controls or manages the Company or any Entity that the Company Controls or manages, or; any Entity under Common Control with the Company, or; any other corporate subsidiary, parent or division of the Company, a Parent or any other Affiliate.

4. **Agreement (with capital "A")** – This Collective Bargaining Agreement (CBA) including any Letters of Agreement or Memorandum of Understanding between the Company and the Union.

5. **Artificial Credit** – Unpaid credit used to adjust or build a schedule due to known absences.

6. **Association** – See *Union*.

7. **Automated Bid System** – A system that constructs monthly schedules for Flight Attendants based on his/her preference and seniority.

8. **Available to Assign (AVA)** – A Flight Attendant available for assignment or reassignment per the terms of this Agreement.

9. **Award** –An assignment given to a Flight Attendant based on his/her individual seniority and bid preferences, or as otherwise provided in this Agreement, as submitted through the Automated Bid System.

10. **Base** – Any geographic locations designated by the Company where Flight Attendants are stationed and their duty assignments are scheduled to begin and end.

11. **Bid** – Preferences submitted by a Flight Attendant through the Automated Bid System.

12. **Bid Period** – A block of time, usually a calendar month, for which Flight Attendants bid and are awarded schedules.  Under no circumstances will a Bid Period be less than 30 days.

13. **Block Hour/Block Time** – The period of time beginning when an aircraft's parking brake is released and the boarding door is closed and ending at Block In.

14. **Block In** - The time at which an aircraft reaches a destination (generally at a gate), the parking brake is set, and the boarding door is open.

15. **Calendar day** – Beginning at 0001 and ending at 2400.

16. **Call-out status** – A period of time when a Reserve Flight Attendant must be available to receive duty assignments from Crew Scheduling.

17. **CDO (Continuous Duty Overnight/Standup)** - A scheduled duty period that begins in one Calendar Day and ends in the following Calendar Day, which includes an overnight stay out of Domicile that is scheduled for less than FAR required minimum rest.

18. **Charter** – An offline or online revenue flight that is not a regularly scheduled flight.

19. **COLA (Company Offered Leave of Absence)** – A voluntary unpaid leave of absence for a period of time as offered by the Company and awarded as described in Article 12.D.

20. **Company** – Frontier Airlines, Inc.

21. **Credit/Credit Time/Credit Hour** – The total amount of time added to a Flight Attendants schedule.  Includes block time, company business, training, or any other time used for pay purposes.

22. **Day off** - A calendar day off free of any duty.

23. **Deadhead** – Transportation at Company direction to or from a duty assignment.

24. **Debrief** – The time allowed for completing post flight duties.

25. **Declared Irregular Operations (DIO)** – A short-term event including weather, airport closure, etc. that significantly disrupts or that is predicted to significantly disrupt at least 25% of the total daily system flight segments.

26. **Domicile** – See *Base*.

27. **DROP** – The removal of flight(s) from the Flight Attendant's schedule.

28. **Duty Assignment**- The assignment of trip or other work by the Company.

29. **Duty Period/Duty Time** – All time a Flight Attendant is on duty, commencing with report for duty and terminating when a Flight Attendant is released from duty.

30. **Emergency Leave** – Unpaid time off for unavoidable serious circumstances up to 3 days with the approval of Inflight management.

31. **Ferry** – A flight that does not transport revenue passengers used to reposition an aircraft to where it is needed.

32.   **Flight Attendant** – An employee of the Company whose name appears on the Flight Attendant Seniority List as defined by Article 10 of this Agreement, and whose duties include the performance of inflight and ground cabin services.

33.   **Flight Attendant Commuter (FAC)** – A Flight Attendant who lives in a different city other than his/her assigned base and commutes to base via air.

34.   **Furlough** – The involuntary removal of a Flight Attendant from active duty as a Flight Attendant due to a reduction in force.

35.   **GO** – Frontier Airlines, Inc., General Offices in Denver.

36.   **Grievance** – A complaint against the Company or another department that alleges contract violations or unfair disciplinary action.

37.   **Ground Time** – The amount of time between flight segments.

38.   **International Flight** – Any flight operating to or from a city outside the United States of America.

39.   **Irregular Operation** – Flights that are delayed or do not operate in accordance with the published schedule because of circumstances such as weather, maintenance, Air Traffic Control, acts of terror, security breaches or other similar circumstances.

40.   **Job Share** – As described in Article 5.E.7., a position offered for one bid period when overstaffing occurs to allow Flight Attendants to work low-time hours.

41.   **Junior Assignment** – An involuntary duty assignment given to a Flight Attendant on a scheduled day off.

42.   **Layover** – An overnight rest period outside the Flight Attendant's base.

43.   **Like Trip** – A replacement trip due to a cancellation, schedule change, or an administrative error. The replacement trip must fall within the following guidelines: Report time no more than 1 hour prior to the original report time and a release time of no more than 3 hours after the original release time for a "Reschedule" or 2 hours after the original release time for a "Reroute".

44.   **Line** – A bid period award built in accordance with this Agreement that consists of assigned trips, days off, and pre-award requests.

45.   **Line Holder** – A Flight Attendant who has been awarded a line.

46.   **Longevity** – the period of time commencing on the Flight Attendant's date of hire (as a Flight Attendant) which shall begin on the first day a Flight Attendant is scheduled to and reports to the Company's Flight Attendant training program and continuing while the Flight Attendant is active, except where specifically stated otherwise in this Agreement.

47.    **Low-time** – As described in Article 5.I a position granted for a defined period of time to Flight Attendants who will be awarded between 37:30 and 58 hours and may work up to 59:59 hours per bid period.

48.    **Mixed Line** – A bid period award built in accordance with this Agreement that consists of trips, blocks of reserve days, days off, and pre-award requests.

49.    **Month** - A calendar month.

50.    **Open Time** – Trips or portions of trips that are unassigned or un-awarded with which Flight Attendants may ADD, or SWAP.

51.    **Positive Contact** – A live telephone or in-person conversation between a Flight Attendant and the Company.

52.    **Pre-award** – Request submitted prior to a bid period to accommodate pre-planned absences including, but not limited to: vacation, scheduled training, Company business, Union days, and jury duty.

53.    **Ready Reserve (RR)** – A period of time as defined in this Agreement when a Reserve Flight Attendant is required to be on reserve at his/her base airport or another base airport.

54.    **Red-eye** – Any Duty Period, other than a CDO, that reports prior to and releases after, or the entire Duty Period occurs between, 0100 and 0300 Local Base Time.

55.    **Release** – Time when a Flight Attendant is relieved from duty.

56.    **Report Time** - The time a Flight Attendant is scheduled to report for a flight assignment, training, or other Company-assigned duty.

57.    **Reroute** - A change to a trip after 1800 the day prior to initial trip report.

58.    **Reschedule** – A change to a trip before 1800 the day prior to an initial trip report.

59.    **Reserve** – A Flight Attendant who was awarded a reserve line.

60.    **Reserve day** – A calendar day when a Reserve Flight Attendant is available for duty assignment.

61.    **Reserve Line** – A bid period award built in accordance with work rules of this Agreement consisting of Reserve days, days off and pre-award requests.

62.    **RGS** – Recurrent Ground School code for the automated bid system.

63.    **RON** – Remain overnight.

64.    **Segment/Leg** - A flight between cities that may or may not terminate in base.

65.   **Seniority/Seniority Date** - The length of service with the Company as a Flight Attendant.

66.   **Short Call** – A notification from Crew Scheduling to a Reserve Flight Attendant that requires the Flight Attendant to report for a duty assignment no later than 2 hours from the time of the call.

67.   **SWAP** – A trip swap with available Open Time via the automated bid system.

68.   **Time Zones** - Unless otherwise specified all times listed in this agreement are Eastern Time.

69.   **TRADE** – An exchange of flying, vacation or reserve days/duty periods (or other activities as allowed by this Agreement) between two Flight Attendants via the automated bid system.

70.   **Transition** - The period of time when trips may overlap bid periods.

71.   **Trip/Sequence/Pairing** – A segment or series of segments over one or more days that begin and end in a Flight Attendant's base.

72.   **Union** – Association of Flight Attendants – CWA, AFL-CIO

73.   **VAC** – Vacation code for the automated bid system.

74.   **Vacancy** – Open Flight Attendant positions at a specified Base.

75.   **Wet Lease** – An Agreement between the Company and another air carrier in which the Company provides aircraft(s) and crew(s) to the other air carrier.

# Exhibit D

*In Re:*

*Equity Participation Grievance*

*Transcript of Proceedings*

*March 20, 2018*



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

```
 1                    FRONTIER AIRLINES

 2  _____

 3  IN THE MATTER OF THE EQUITY PARTICIPATION GRIEVANCE:

 4  THE GRIEVANTS,

 5  and

 6  FRONTIER AIRLINES, INC.,

 7  and

 8  ASSOCIATION OF FLIGHT ATTENDANTS-CWA.

 9  _____

10

11                  TRANSCRIPT OF PROCEEDINGS

                         March 20, 2018

12

13  _____

14

15

16

17

18

19

20

21

22

23

24

25
```

In Re:
Equity Participation Grievance

Transcript of Proceedings
March 20, 2018

Page 58

1          Q.  Because that article says that profit sharing

2    shall be exclusively for Frontier flight attendants on

3    the seniority list as of January 1, 2012?

4          A.  Correct.

5          Q.  So you received profit sharing for the year

6    2014.  Now you worked in 2015 until when?

7          A.  November.

8          Q.  So you worked at least 10 months, a little

9    bit more than 10 months, of 2015?

10         A.  I did.

11         Q.  Then you left?

12         A.  I did.

13         Q.  And you did not receive profit sharing for

14   2015, did you?

15         A.  No.

16         Q.  And you're aware there was a profit sharing

17   payment for 2015?

18         A.  Yes.

19         Q.  Despite the fact that you were on the list as

20   of January 1, 2012, and that you worked most of 2015,

21   you didn't get a profit sharing payment, right?

22         A.  No.

23         Q.  And you didn't file a grievance challenging

24   that, right?

25         A.  No.

Page 80

```
 1        A.  It would be that I was not specifically
 2   excluded in Article 24.
 3        Q.  You retired in October 2016, right?
 4        A.  That's correct.
 5        Q.  And did you receive any profit sharing
 6   payment for the profit sharing for the calendar year
 7   2016?
 8        A.  No.
 9        Q.  Other than the grievance that is being
10   addressed in this arbitration, have you ever filed a
11   grievance against Frontier?
12        A.  No.
13        Q.  Who did you tell from AFA when you were going
14   to retire?  Who did you advise that you were about to
15   retire?  Anyone?
16        A.  I went through the process with the inflight
17   management.
18        Q.  That's Frontier, right?
19        A.  Right.
20        Q.  My question was about AFA, the Union.
21        A.  It was just general conversation that people
22   knew that I was going to retire.
23             MR. BARTOS:  All right.  I don't have any
24   further questions.
25             THE CHAIRMAN:  Mr. Hollinger.
```

Page 181

1          Q.   What was the result of the vote at the end?

2          A.   It was not ratified.

3          Q.   So at that point Article 24 continues on in

4     the agreement, correct?

5          A.   Yes.

6          Q.   Now I'd like to direct your attention to

7     Joint Exhibit 1A, which is a single page, which is

8     Article 24.  And I'd like to direct your attention to

9     24B.  Is that the profit-sharing provision?

10         A.   Yes.

11         Q.   And this is in the same article as equity

12    participation, right?

13         A.   It is.

14         Q.   Now looking at Article 24D, Additional

15    Provisions --

16         A.   Yes.

17         Q.   -- that language applies to both equity

18    participation and profit sharing, right?

19         A.   It does.

20         Q.   Was there a profit sharing payment for

21    calendar year 2014?

22         A.   There was.

23         Q.   And was that the first year for which there

24    was any profit sharing under the contract?

25         A.   Yes.

Page 182

1          Q.   When was that payment made?

2          A.   In April 2015.

3          Q.   If it was for the year 2014, why was it not

4    paid until April 2015?

5          A.   That's consistent with the provisions in

6    Article 24B, number 5.

7          Q.   Does Article 24 define how profit sharing is

8    to be distributed among eligible flight attendants?

9          A.   It does not.

10         Q.   For the 2014 profit sharing, who decided how

11   the profit-sharing amount was to be distributed?

12         A.   AFA, the MEC.

13         Q.   And did AFA also make decisions about who

14   would be eligible for participation in the profit

15   sharing for 2014?

16         A.   Yes.

17         Q.   And was that also the MEC?

18         A.   Yes.

19         Q.   And for the 2014 profit sharing, what were

20   the eligibility requirements decided by the MEC?

21         A.   The eligibility requirements were that you

22   had to be a flight attendant on the seniority list,

23   Frontier seniority list -- Frontier Flight Attendant

24   Seniority List as of January 1, 2012, and worked as a

25   flight attendant in 2014 and currently be employed as a

1  flight attendant as of April 1, 2015.

2      Q.  So given those requirements, what would

3  happen to a flight attendant who worked all of 2014 but

4  then resigns or retires on March 30 of 2015?  Would they

5  get any participation?

6      A.  No.

7      Q.  How was this communicated to the membership,

8  this eligibility determination?

9      A.  We sent an E-line to the membership.

10     Q.  I'd like you to show you AFA 7.

11         (AFA Exhibit 7 was marked.)

12         THE CHAIRMAN:  I'm marking for identification

13  AFA Exhibit 7, a document dated February 18, 2015.

14     Q.  (By Mr. Bartos) Is AFA 7 an E-line that was

15  sent by AFA regarding profit sharing?

16     A.  Yes.

17     Q.  And at the bottom it indicates it's from

18  Angie and Sherrie?

19     A.  Yes.

20     Q.  Are you Sherrie?

21     A.  I am.

22     Q.  Could you read into the record the first

23  sentence of the second full paragraph.

24     A.  "To be eligible for profit sharing, the

25  contract stipulates that a Flight Attendant must have

Page 184

1    been employed on 1/1/2012 and still be a Flight

2    Attendant at the time of the payout."

3         Q.  Did you agree with that position?

4         A.  I did.

5         Q.  And which part of the contract stipulates

6    that a flight attendant must still be a flight attendant

7    at the time of the payout?

8         A.  Article 24D.

9         Q.  Did Frontier ever object to the AFA's

10   determination as to the eligibility requirements?

11        A.  No.

12        Q.  And did you conduct meetings amongst the

13   flight attendants about how the pool of money would be

14   allocated amongst eligible flight attendants?

15        A.  We did.

16        Q.  And in those meetings did you discuss the

17   eligibility questions -- the eligibility criteria?

18        A.  We did.

19        Q.  I'd like to show you a document we'll mark as

20   AFA 8.

21             (AFA Exhibit 8 was marked.)

22             THE CHAIRMAN:  A document dated March 3,

23   2015, I'm marking as AFA Exhibit 8 for identification.

24        Q.  (By Mr. Bartos) Can you describe,

25   Ms. Thompson, generally, what is AFA Exhibit 8?

Page 185

1          A.   It's meeting minutes from a physical meeting

2     that we had in Denver, as well as a Skype meeting to

3     include anybody who was not able to make the Denver

4     meeting.

5          Q.   And directing your attention to the bottom of

6     the first page, there's two questions.  One is, Who is

7     eligible for Profit Sharing?  And one is, Who is not

8     eligible for Profit Sharing?  Do you see that?

9          A.   I do.

10         Q.   Did those represent the positions of the

11    Frontier MEC?

12         A.   Yes.

13         Q.   The answers to those questions?

14         A.   Yes.

15         Q.   Was there also profit sharing for the year

16    2015?

17         A.   There was.

18         Q.   And what about 2016 and 2017?

19         A.   2016.

20         Q.   And for years 2015 and 2016, did the same

21    eligibility rules continue to apply?

22         A.   Yes.

23         Q.   You talked a little bit about the projection

24    vote of the 2014 Tentative Agreement.  I'm wondering,

25    after that time, did the MEC take any steps to realize

```
 1        A.   That's correct.
 2        Q.   In the years since Article 24 was included in
 3   the 2011 CBA, there have been a number of profit-sharing
 4   payments, correct?
 5        A.   Yes.
 6        Q.   Is it your understanding, based on the input
 7   that you received from the AFA, that the Company did not
 8   make any of those payments to flight attendants who were
 9   not on the property as of the payout date?
10        A.   That is correct.
11             MR. HOLLINGER:  Thank you.  I have no further
12   questions.
13             THE CHAIRMAN:  Mr. Bartos.
14             MR. BARTOS:  I have nothing further.
15             THE CHAIRMAN:  Cross-examination.
16             MR. WALKE:  Very briefly.
17                      CROSS-EXAMINATION
18   BY MR. WALKE:
19        Q.   Ms. Peter, you know my name is Jason Walke.
20        A.   Yes, I do.
21        Q.   I represent the Grievants in this case.  And
22   as I always say at the beginning of my
23   cross-examination, if you don't understand my question
24   or if you don't hear it, will you please let me know so
25   I can re-ask my question?
```