IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

ADELINE CLARK, et al.                          No. 4:17-CV-00452-JEG-RAW

    Plaintiffs,

vs.

FRONTIER AIRLINES, INC.

    Defendant.

**DECLARATION OF KELLIE L. PASCHKE IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

    I, Kellie L .Paschke, submit the following declaration in opposition to Defendant's Motion to Dismiss filed by Frontier Airlines, Inc. in the above captioned matter.

    1.    I am an attorney with Skinner & Paschke, PLLC and the attorney principally responsible for the representation of Plaintiffs in this matter.

    2.    I participated as Plaintiffs' counsel during the March 20, 2018 System Board of Adjustment hearing referenced in Plaintiffs' First Amended and Substituted Complaint.  The following materials are part of the record from that hearing:

        a.    Exhibit 1 to this Declaration is a true and correct copy of an excerpt from the transcript for the March 20, 2018 hearing.  I direct the Court's attention to the remarks by Mr. Bartos on page 12, lines 13-19.  Mr. Bartos participated in the hearing on behalf of the AFA-CWA.

1

b.      Exhibit 2 to this Declaration is a true and correct copy of an excerpt from the transcript for the March 20, 2018 hearing.  I direct the Court's attention to the remarks by Mr. Hollinger on page 16, lines 3-6.  Mr. Hollinger participated in the hearing on behalf of the Defendant.

c.      Exhibit 3 to this Declaration is a true and correct copy of excerpts from the transcript for the March 20, 2018 hearing.  I direct the Court's attention to Ms. Schweitzer's testimony on page 102, lines 2-14, page 113, lines 9-22, and page 114, lines 3-6.  Ms. Schweitzer participated in the hearing as an employee of Frontier and a member of the Union.

d.      Exhibit 4 to this Declaration is a true and correct copy of excerpts from the transcript for the March 20, 2018 hearing.  I direct the Court's attention to Ms. Thompson's testimony on pages 181, line 6 through page 183, line 6. Ms. Thompson participated in the hearing as an employee of Frontier and a member of the Union.

e.      Exhibit 5 to this Declaration is a true and correct copy of excerpts from the transcript for the March 20, 2018 hearing.  I direct the Court's attention to Ms. Peter's testimony on page 246, lines 7-14.  Ms. Peter participated in the hearing as an employee of Frontier.

f.      Exhibit 6 to this Declaration is a true and correct copy of excerpts from the transcript for the March 20, 2018 hearing.  I direct the Court's attention to the remarks by arbitrator Gilmartin on page 226, line 24 through page 227, line 4.  Mr. Gilmartin was an arbitrator appointed by the AFA-CWA to preside over the hearing.

      g.        Exhibit 7 to this Declaration is a true and correct copy of an affidavit executed by Darol Glasscock and submitted in place of live testimony for the March 20, 2018 hearing.

      3.        The evidentiary record in the arbitration was closed on May 1, 2018.   At the time it was closed, Plaintiffs had not been provided a copy of the hearing transcript from the March 20, 2018 arbitration hearing.

      4.        After receiving and reviewing the transcript, I confirmed that testimony submitted by witnesses for the Defendant was inconsistent with information provided to me by Darol Glasscock, a Plaintiff in this action.

      5.        Exhibit 8 to this Declaration is a true and correct copy of a "Pay Statement" provided by Plaintiff Darol Glasscock which reflects a profit-sharing payment for the calendar year 2014, paid on April 30, 2015.  Importantly, Plaintiff Darol Glasscock terminated his employment with Frontier Airlines on or about March 26, 2015 and, therefore, was no longer employed by the Defendant when he received this profit sharing payment, in direct contradiction to the testimony offered.

      6.        Exhibit 8 is being offered to rebut Defendant's Exhibit D offered by Frontier in Frontier's Supplemental Declaration of Chris A. Hollinger in Support of Defendant Frontier Airlines, Inc.'s Motion to Dismiss Plaintiffs' Complaint (ECF 14-1), and in support of Plaintiffs' Exhibits 4-5, as it is integral to Defendant's claim.

      I declare, under penalty of perjury under the law of the United States of America, that the foregoing is true and correct.

Kellie L. Paschke

# Exhibit 1

*In Re:*

*Equity Participation Grievance*

*Transcript of Proceedings*

*March 20, 2018*



Stevens-Koenig
Reporting

700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

 1   against the Airline, and it's our position that the

 2   Union shouldn't be involved in this process at all.

 3            So with that, we'll call our first witness.

 4            THE CHAIRMAN:  Well, let's find out if we

 5   have an opening statement from either the Company or the

 6   Union.  Mr. Bartos, do you have an opening statement?

 7            MR. BARTOS:  I do.

 8            THE CHAIRMAN:  You may proceed.

 9            MR. BARTOS:  This is a grievance that

10   involves two Collective Bargaining Agreements.  One is

11   the underlying 2011 Collective Bargaining Agreement that

12   has in it Article 24.

13            And the second is an agreement reached

14   between the AFA and Frontier in 2017, which, among other

15   things, modified the 2011 CBA, eliminated any obligation

16   under Article 24A, the Equity Participation, and

17   authorized the AFA to determine the eligibility of

18   flight attendants for participation in a cash payment

19   that was made by Frontier.

20            Just a little bit of the context so that it

21   will be helpful for the board as the evidence comes in,

22   the Union was certified as the representative of the

23   Frontier flight attendants in 2010, a time when Frontier

24   was in financial distress.  Republic Airlines had

25   purchased Frontier and was seeking labor cost

# Exhibit 2

*In Re:*

*Equity Participation Grievance*

*Transcript of Proceedings*

*March 20, 2018*



Stevens-Koenig Reporting

700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

1      THE CHAIRMAN:  Mr. Hollinger, would you like

2  to give an opening statement on behalf of the Company?

3      MR. HOLLINGER:  I would, and I'll keep my

4  remarks brief.  We, first of all, want to make it very

5  clear that the Company is fully supportive and fully in

6  line with the Union's position in this case.

7      It has always been the Company's

8  understanding, both under Article 24 of the 2011 CBA and

9  under the 2017 equity LOA, that it was generally up to

10 the Union to decide the specific eligibility and

11 allocation criteria for payouts to individual flight

12 attendants.

13      To think of it differently or to say it

14 differently, the Company bargained with the Union over

15 the size of the overall pie, but the Union would

16 determine whether a particular flight attendant received

17 a slice of the pie and, if so, the size of the slice.

18      And that's sort of how the Company has always

19 understood the arrangements to be with the Union in

20 these matters, both profit sharing and under the equity

21 participation.

22      This arrangement is stated expressly in the

23 equity LOA.  It was not stated expressly in Article 24

24 of the 2011 CBA, but it was understood by the parties

25 nonetheless.  The most important point, the Company

# Exhibit 3

*In Re:*

*Equity Participation Grievance*

*Transcript of Proceedings*

*March 20, 2018*



Stevens-Koenig
Reporting

700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

1    investments, the cuts.

2         Q.   Now let's look at Article 24 of the CBA,

3    which has previously been admitted as J1.  Why was

4    Article 24 included in the CBA at all?

5         A.   Because we wanted a guarantee that we would

6    still have the offer from the Company.  If we did -- if

7    we kept it on the side and did not put it as part of our

8    contract, they could have rescinded it at any time.

9         Q.   So you wanted a guarantee of what?

10        A.   We wanted to memorialize their promise to

11   give us something back in exchange for the cuts.

12        Q.   Is that what you would define as the purpose

13   of 24?

14        A.   Yes.

15        Q.   Why was -- if you know, why was Article 24

16   last in the CBA?

17        A.   I don't know.

18        Q.   Can you look at Article 24 and show me where

19   there or anywhere else in the CBA the word "equity" is

20   defined?

21        A.   I don't see it defined.

22        Q.   As used in Article 24, what did the word

23   "equity" mean to you at the time?

24        A.   I was not sure at the time.

25        Q.   What, if anything, was done to specifically

1     MR. BARTOS:  Objection.  Foundation.

2     THE CHAIRMAN:  Overruled.  Based on my prior

3 ruling, she can answer.

4     A.  I don't see anything referring to 24D.

5 Everything refers to 24A.  And I don't think it would

6 eliminate 24D because it also discusses the

7 profit-sharing program and that's still valid, so it

8 wouldn't eliminate 24D.

9     Q.  (By Mr. Walke) Do you think -- as someone

10 that's been involved in this process from the

11 negotiation of the CBA all the way up to today, do you

12 think that Article 24A has ever been triggered?

13     A.  I do not believe so, but --

14     Q.  You don't think there's ever been an equity

15 payment?

16     A.  I do not believe so.  With the exception of

17 this Letter of Agreement, I mean.  But prior to that,

18 no.

19     Q.  What do you mean?

20     A.  This was an equity payment to dissolve 24A.

21 But prior to that I don't believe that there was

22 anything that would have triggered it.

23     Q.  One thing I always say is that pronouns get

24 us in trouble.  I don't know if "this" is a pronoun, but

25 you just said, "This was an equity payment."  You mean

1    the Letter of Agreement?

2         A.   Letter of Agreement.

3         Q.   So let me ask a question so we're clear for

4    the record, as clear as we can possibly be.  Your

5    testimony is that the Letter of Agreement was a

6    $40 million equity payment?

7         A.   I believe it's an equity payment.

8         Q.   Can you turn to what's in the binder there as

9    the next -- it's the Biffle letter.

10             THE CHAIRMAN:  Grievants Exhibit 2?

11             MR. WALKE:  Yes, sir.  Thank you.

12        Q.   (By Mr. Walke) Now this isn't particularly

13   long, Erika -- pardon me -- Ms. Schweitzer.  Can you

14   just take the time to skim through that and read it.  I

15   know you didn't write it, but I want to ask you

16   questions about it.

17             THE CHAIRMAN:  Let us know when you're

18   finished, Ms. Schweitzer.

19        A.   Okay.  I'm finished.

20        Q.   (By Mr. Walke) Barry that wrote this, is

21   that -- do you know, is that Barry Biffle?

22        A.   As far as I know, yes.

23        Q.   And who is Barry Biffle, if you know?

24        A.   He is the CEO of Frontier Airlines.

25        Q.   Do you remember getting this letter before

# Exhibit 4

*In Re:*

*Equity Participation Grievance*

*Transcript of Proceedings*

*March 20, 2018*



Stevens-Koenig Reporting

700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Page 181

1      Q.   What was the result of the vote at the end?

2      A.   It was not ratified.

3      Q.   So at that point Article 24 continues on in

4   the agreement, correct?

5      A.   Yes.

6      Q.   Now I'd like to direct your attention to

7   Joint Exhibit 1A, which is a single page, which is

8   Article 24.   And I'd like to direct your attention to

9   24B.   Is that the profit-sharing provision?

10     A.   Yes.

11     Q.   And this is in the same article as equity

12  participation, right?

13     A.   It is.

14     Q.   Now looking at Article 24D, Additional

15  Provisions --

16     A.   Yes.

17     Q.   -- that language applies to both equity

18  participation and profit sharing, right?

19     A.   It does.

20     Q.   Was there a profit sharing payment for

21  calendar year 2014?

22     A.   There was.

23     Q.   And was that the first year for which there

24  was any profit sharing under the contract?

25     A.   Yes.

1      Q.   When was that payment made?

2      A.   In April 2015.

3      Q.   If it was for the year 2014, why was it not

4    paid until April 2015?

5      A.   That's consistent with the provisions in

6    Article 24B, number 5.

7      Q.   Does Article 24 define how profit sharing is

8    to be distributed among eligible flight attendants?

9      A.   It does not.

10     Q.   For the 2014 profit sharing, who decided how

11   the profit-sharing amount was to be distributed?

12     A.   AFA, the MEC.

13     Q.   And did AFA also make decisions about who

14   would be eligible for participation in the profit

15   sharing for 2014?

16     A.   Yes.

17     Q.   And was that also the MEC?

18     A.   Yes.

19     Q.   And for the 2014 profit sharing, what were

20   the eligibility requirements decided by the MEC?

21     A.   The eligibility requirements were that you

22   had to be a flight attendant on the seniority list,

23   Frontier seniority list -- Frontier Flight Attendant

24   Seniority List as of January 1, 2012, and worked as a

25   flight attendant in 2014 and currently be employed as a

1   flight attendant as of April 1, 2015.

2       Q.   So given those requirements, what would

3   happen to a flight attendant who worked all of 2014 but

4   then resigns or retires on March 30 of 2015?  Would they

5   get any participation?

6       A.   No.

7       Q.   How was this communicated to the membership,

8   this eligibility determination?

9       A.   We sent an E-line to the membership.

10      Q.   I'd like you to show you AFA 7.

11           (AFA Exhibit 7 was marked.)

12           THE CHAIRMAN:   I'm marking for identification

13   AFA Exhibit 7, a document dated February 18, 2015.

14      Q.   (By Mr. Bartos) Is AFA 7 an E-line that was

15   sent by AFA regarding profit sharing?

16      A.   Yes.

17      Q.   And at the bottom it indicates it's from

18   Angie and Sherrie?

19      A.   Yes.

20      Q.   Are you Sherrie?

21      A.   I am.

22      Q.   Could you read into the record the first

23   sentence of the second full paragraph.

24      A.   "To be eligible for profit sharing, the

25   contract stipulates that a Flight Attendant must have

# Exhibit 5

*In Re:*

*Equity Participation Grievance*

---

*Transcript of Proceedings*

*March 20, 2018*

---



Stevens-Koenig
Reporting

700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Page 246

1   sent this on August 12, the language was sent to me --

2   and, I believe, Ken was cc'd -- on August 10.

3        Q.   Do you know which -- other than the Union,

4   generally, do you know which human being drafted the

5   language that you received from Ms. Balzer?

6        A.   No.  I have no idea.

7        Q.   If I could turn your attention back to the

8   text of Article 24D, is it your understanding, based on

9   the text and any discussions that you may have had with

10  the Union at the time, that the criteria for determining

11  eligibility for equity participation and the

12  profit-sharing program would be the same, whatever they

13  were?

14       A.   Yes.

15       Q.   So then my first question for you -- again,

16  based on the text and any understandings that you

17  developed through discussions with the Union -- was it a

18  requirement for a person to receive equity participation

19  or profit-sharing payments for that person to be a

20  Frontier flight attendant?

21       A.   That is correct.  They had to be a Frontier

22  flight attendant.

23       Q.   And is the term "Flight Attendant" defined --

24  I notice it's got initial caps here in letter D -- is it

25  defined anywhere in the Collective Bargaining Agreement?

# Exhibit 6

*In Re:*

*Equity Participation Grievance*

*Transcript of Proceedings*

*March 20, 2018*



700 17th Street, Suite 1750
Denver, CO  80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig
Reporting

1          Q.   My question is, we know that the Letter of

2     Agreement ultimately included an indemnity.  The Union

3     agreed to indemnify the Airline for any disputes, like

4     the one we're talking about here, right?

5          A.   Right.

6          Q.   Why wasn't that in AFA 5?  What changed?

7          A.   I can't answer that.

8          Q.   Why not?

9          A.   There's a difference in the agreements.  One

10    was an overall benefit to our contract for all flight

11    attendants with the exception of Article 24.  The other

12    was an exchange -- a settlement in exchange for the

13    language in Article 24A, which removed the language in

14    Article 24A with the signing of this Letter of

15    Agreement.

16         Q.   I still don't -- I don't understand why you

17    would have an indemnity agreement in one and not the

18    other.

19         A.   Well, that was part of the negotiations.

20         Q.   Between who and who?

21         A.   Between the Company and AFA.

22         Q.   Whose idea was the indemnity agreement?

23         A.   I do not know.

24         Q.   Was that the Union's idea?

25              MR. GILMARTIN:  I think she answered the

1   question.  She did not know.

2           THE CHAIRMAN:  The board members cannot make

3   an objection.

4           MR. GILMARTIN:  I apologize.

5           THE CHAIRMAN:  The question stands.  We'll

6   have an answer.

7           MR. SWANSON:  I'm just going to object.

8   Asked and answered.

9           THE CHAIRMAN:  Overruled.

10      Q.   (By Mr. Walke) Did the Union suggest an

11  indemnity agreement where they would indemnify the

12  Airline?

13      A.   Honestly, I don't know.

14      Q.   Does that seem logical to you, that the Union

15  would say, Hey, here's what we want to do; we want to

16  step up and indemnify you for any third-party claims

17  that get made against you in connection with all of

18  this?

19      A.   I don't know.  It could have been something

20  that the Company proposed.  It could have been -- I

21  don't know.

22      Q.   Do you have any memory as to why that was

23  discussed and agreed upon, ultimately?

24      A.   I don't.

25      Q.   You were a member of the task force.  You

# Exhibit 7

### AFFIDAVIT OF DAROL GLASSCOCK

COMES NOW, Darol Glasscock, and does hereby state and depose as follows:

1. My name is Darol Glasscock. I am an adult person who resides in the State of Nevada.

2. I am currently under the care of a Medical Oncologist, Dr. Nicholas Vogelzang, for the treatment of a rare and life-threatening form of bladder cancer. Due to my health condition, Dr. Vogelzang has advised that I cannot safely provide live testimony in this matter for at least six months. A copy of his recommendation is attached. Therefore, I am signing this affidavit because it accurately reflects my memory about matters before the System Board of Adjustment.

3. Beginning on January 2, 2007 through March 8, 2017 I was employed as a flight attendant for Frontier Airlines. My employee number was 08077.

4. During my employment with Frontier Airlines, I was a member of the union representing flight attendants – Association of Flight Attendants – CWA, AFL-CIO. In 2010, I was appointed to the Negotiating Committee directly responsible for negotiating a Collective Bargaining Agreement between the union and Frontier Airlines.

5. During 2010 and 2011 while I was a Negotiating Committee member, Frontier Airlines requested that flight attendants make salary and benefit concessions in order to help the company save money. These concessions were termed "Flight Attendant Restructuring Investments".

6. In exchange for the investments being made by the flight attendants, the Negotiating Committee requested incentives be provided to the flight attendants. These incentives included, among other things, equity participation, profit sharing, and snapbacks. They were memorialized in Article 24 of the proposed 2011-2016 Collective Bargaining Agreement.

7. In 2011, I participated in Union "Road Shows" and other various activities to help educate our union members on the contents of the proposed 2011-2016 Collective Bargaining Agreement. My participation in these events included a presentation about the differences between our proposed Agreement and those offered to flight attendants at other airlines.

8. At no time during the negotiation, ratification, or implementation of the 2011-2016 Collective Bargaining Agreement do I recall any person providing information regarding eligibility requirements for the Equity Participation provision of Article 24A and 24D. Specifically, and to the best of my recollection, union members were not informed that they must remain continuously employed to receive Equity Participation payments.

9. After the 2011-2016 Collective Bargaining Agreement was ratified on August 29, 2011, I remained involved in Union activities. During that time, I actively encouraged members to vote on issues affecting our Agreement. In doing so, I often tried to identify the potential pros and cons of each vote so that members could make an informed decision. I did not direct or encourage members to vote for or against changes to the Agreement.

Dated this 16th day of April, 2018.

_____
DAROL GLASSCOCK

I hereby acknowledge and affirm this signed Affidavit was provided to me electronically by Darol Glasscock, and it contents and signature were verified by me, a notary public, in and for the State of Iowa on this 16th day of April, 2018.

_____
Kellie L. Paschke

# Exhibit 8

Print Preview

6/22/18, 4:06 PM

# Pay Statement

This is a statement of earnings and deductions. This pay statement is non-negotiable.



Frontier Airlines, Inc
4545 Airport Way
Denver, CO 80239

| | |
|---|---|
| Pay Statement | |
| Period Start Date | 04/29/2015 |
| Period End Date | 04/29/2015 |
| Pay Date | 04/30/2015 |
| Document | 503260 |
| Net Pay | $4,235.35 |

## Pay Details

Darol Ray Glasscock

| | |
|---|---|
| Employee Number | 408077 |
| SSN | |
| Job | Flight Attendant |
| Pay Rate | $31.58 |
| Pay Frequency | Semi-Monthly |

| | |
|---|---|
| Pay Group | Frontier Flight Attendant |
| Location | DEN Flight Crew F9 |
| Division | FLTOPS - Flight Operations |
| Cost Center | 5110 - Inflight |
| HR Dept | 30 - Flight Attendant |
| GL Dept | 6137 - ORDABUSFA |

| | |
|---|---|
| Federal Income Tax | S0 |
| CO State Income Tax (Residence) | S0 |
| CO State Income Tax (Work) | S0 |

## Earnings

| Pay Type | Hours | Pay Rate | Current | YTD |
|---|---|---|---|---|
| Bonus | 0.0000 | | $4,828.75 | $4,828.75 |
| Co Busines Hrs | 0.0000 | | $0.00 | $1,326.36 |
| F9 Card Incent | 0.0000 | | $0.00 | $50.00 |
| FA Hrs AVA | 0.0000 | | $0.00 | $304.12 |
| FA pay FMLA | 0.0000 | | $0.00 | $268.43 |
| Non Tax Pr Diem | 0.0000 | | $0.00 | $1,263.03 |
| Over 75 Hours | 0.0000 | | $0.00 | $694.76 |
| Over 82 Hours | 0.0000 | | $0.00 | $676.91 |
| Reg Guarant Tim | 0.0000 | | $0.00 | $3,496.88 |
| Regular Pay | 0.0000 | | $0.00 | $2,566.82 |
| Taxable Per Die | 0.0000 | | $0.00 | $18.47 |
| Union Hrs | 0.0000 | | $0.00 | $157.90 |
| Vacation Payout | 0.0000 | | $0.00 | $2,842.20 |
| | | | | |
| Total Hours | 0.0000 | | | |

## Deductions

| | | Employee | |
|---|---|---|---|
| Deduction | Pre-Tax | Current | YTD |
| 401K Loan 1 | No | $0.00 | $413.20 |
| 401K Loan 2 | No | $0.00 | $190.00 |
| 401K No Match | Yes | $0.00 | $455.07 |
| CI EE NoSmoke | No | $0.00 | $16.78 |
| CI Well Premium | No | $0.00 | $12.80 |
| Comp Paid ADD | No | $0.00 | $0.00 |
| Comp Paid Life | No | $0.00 | $0.00 |
| Healthcare Flex | Yes | $0.00 | $720.00 |
| Roth Deduction | No | $0.00 | $262.48 |
| Standard Dental | Yes | $0.00 | $0.00 |
| Traditional Wel | Yes | $0.00 | $605.44 |
| UniformDed 2 | No | $0.00 | $13.93 |
| Union Dues | No | $0.00 | $168.00 |
| Vision Plan | Yes | $0.00 | $0.00 |
| Voluntary LTD | No | $0.00 | $28.71 |
| Voluntary Accid | No | $0.00 | $50.24 |
| Voluntary STD | No | $0.00 | $92.17 |
| Whole Life | No | $0.00 | $190.72 |

## Taxes

| Taxes | Current | YTD |
|---|---|---|
| CO State Income Tax | $224.00 | $693.00 |
| Denver EE Withholding | $0.00 | $23.00 |
| Employee Medicare | $70.02 | $233.04 |
| Social Security Employee Tax | $299.38 | $996.45 |

## Paid Time Off

| Plan | Current | Balance |
|------|---------|---------|
| F9 Crew Sick | 0.0000 | 16.6500 |
| F9 Crew Vacat | 0.0000 | -34.2000 |

## Net Pay Distribution

| Account Number | Account Type | Amount |
|----------------|--------------|--------|
| ▄▄▄▄▄▄▄▄▄ | Checking | $4,235.35 |
| Total | | $4,235.35 |

## Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|--|-------|-------------------|-------|------------|---------|
| Current | $4,828.75 | $4,828.75 | $593.40 | $0.00 | $4,235.35 |
| YTD | $18,494.63 | $15,616.77 | $1,945.49 | $3,219.54 | $13,329.60 |

*Originally printed in English*